UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RAMON SOTO,                                    :

               Plaintiff,               :            14 Civ. 7440 (AJP)

        -against-                    :            **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of Social    :
Security,
                              :
             Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Ramon Soto, represented by counsel, brings this action pursuant to § 205(g)

of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner

of Social Security denying him Social Security Supplemental Security Income and  Disability

Insurance Benefits  (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-motions

for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 12: Comm'r Notice of

Motion; Dkt. No. 19: Soto Notice of Motion.)  The parties have consented to decision of the case

by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 23.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 12) is GRANTED and Soto's motion (Dkt. No. 19) is DENIED.

## FACTS

### Procedural Background

        On June 10, 2010, Soto applied for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") alleging that he was disabled since November 15, 2009.  (Dkt.

No. 15: Administrative Record filed by the Comm'r ("R.") 195, 199.)  Soto alleged disability due

to a back injury, depression, high blood pressure and diabetes.  (R. 238.)  The Social Security

Administration ("SSA") found that Soto was not disabled, and denied the application.  (R. 111-16.)

Soto requested an administrative hearing.  (R. 118-19.)

Administrative Law Judge ("ALJ") Lucien A. Vecchio conducted a hearing on

August 10, 2011 (R. 26-35) and on September 21, 2011, issued a written decision finding Soto not

disabled (R. 90-102).  On April 20, 2012, the Appeals Council vacated ALJ Vecchio's decision, and

remanded the case for a new hearing (R. 106-09).  ALJ Sheena Barr conducted a hearing on October

2, 2012 (R. 36-88), at which Soto appeared with non-attorney representative Victor Ferrer (R. 39).

On December 19, 2012, ALJ Barr issued a written decision finding Soto not disabled.  (R. 6-21.)

ALJ Barr's decision became the Commissioner's final decision when the Appeals Council denied

review on July 8, 2014.  (R. 1-3.)

**<u>Non-Medical Evidence & Testimony</u>**

Soto, born on February 16, 1965, was forty-four years old at the alleged November

15, 2009 onset of his disability, and forty-seven on the date of his October 2, 2012 hearing.  (R. 43,

195.)  Soto was born in Puerto Rico and moved to the United States at age three. (R. 372.)  He

attended school through the tenth or eleventh grade.  (R. 44.)  Soto has "a little bit" of vocational

training in custodial maintenance.  (R. 45.)

Between May 1999 and July 2001, Soto worked as a stock clerk in a distribution

center.  (R. 272.)  Between September 2002 and November 2004, Soto worked in the stock and

maintenance departments of Modell's, a sporting goods store.  (R. 49-50, 258.)  At Modell's, Soto

frequently lifted boxes weighing up to fifty pounds, but due to the onset of diabetes he "wasn't

feeling too good," and required assistance when doing so.  (R. 50, 259.)  Between February 2005

and June 2007, Soto worked as a stock clerk at Duane Reade.  (R. 48, 258.)  Soto "had a problem"

with his supervisor at Duane Reade, and they "got rid" of him.  (R. 48.)  Between April 2008 and October 2009, as part of a welfare program, Soto performed seasonal maintenance for New York City Parks and Recreation in Queens.  (R. 47, 258, 272.)  In November 2009, Soto worked in stock and maintenance at a clothing store for about three months.  (R. 46-47.)

Soto lives with his mother in an elevator building in the Bronx.  (R. 44, 247.)  Soto dresses and bathes himself, although sometimes his mother helps him put on his socks.  (R. 58, 248-49.)  Soto performs household chores such as washing dishes, laundry and ironing.  (R. 62-63, 250.)  Soto is able to mop and sweep, but states that it hurts his back to do so.  (R. 63.)  Soto prepares meals two or three times a day, which takes about an hour.  (R. 249.)  Soto cooks his mother's breakfast (R. 60), but claims that he cannot cook for more than two people  (R. 63.)  Soto leaves his apartment every day, and travels independently by foot, train or bus.  (R. 250.)  Soto shops for food and clothes when he has "enough money."  (R. 251.)  Soto reported that his ability to pay bills, handle a savings account and use a checkbook has not changed since the alleged onset of his disability.  (R. 251.)   Soto does not have many friends because he believes they bring problems. (R. 59.)  Soto has difficulty interacting with authority figures, because he thinks that "someone's doing something" to him or "following" him.  (R. 65.)  Soto has served two prison terms, including for homicide.  (R. 66, 68, 454-55.)

Soto sees a psychiatrist for depression every three months (R. 53), and testified that he receives counseling from a therapist at Bronx Lebanon Medical Center every other day (R. 53).  Soto is a recovering heroin and cocaine addict (R. 422), and spends his days attending programs for drug addiction recovery (R. 61, 247, 252)  Soto arrives at his first daily program at six or seven each morning to receive methadone treatment (R. 61-62), then attends programs at the YMCA and Citywise and returns home around three in the afternoon (R. 61-62).  The programs are within

walking distance of each other, and unless Soto has a doctors appointment he attends each of the three addiction recovery programs every day.  (R. 61.)  After his programs, Soto helps his mother with "whatever she needs."  (R. 247.)

Soto reported that he has trouble remembering things, and stress and changes to his schedule elevate his blood pressure and cause him to be depressed.  (R. 254.)  Soto testified that he could lift about ten pounds, but would not be able to do so repeatedly.  (R. 57.)  Soto stated that he can stand for about half an hour, and sit for about an hour.  (R. 56-57.)  While Soto reported that he tries to walk "a lot"every day  (R. 247), he testified that he is only able to walk half a block before he needs to stop and rest for five to ten minutes, and expects he will "need a cane very soon" (R. 56, 253).  In his application for benefits, Soto reported that when he picks up his legs or stands for too long, it feels as if someone shot him in the back.  (R. 249, 255.)  Soto asserted that walking, sitting and standing cause pain that lasts for as long as he walks, sits or stands.  (R. 52, 256.)  Soto also indicated that he is unable to  climb stairs, kneel, squat, reach or use his hands because his right foot, "back and legs will hurt . . . real bad." (R. 252.)  Soto is prescribed 800 milligrams of Ibuprofen every six hours, but claims that the medication only alleviates his pain for two hours.  (R. 256.)  In addition to his other ailments, Soto testified that due to his high blood pressure he "faint[s] sometimes." (R. 52.)

**Medical Evidence Before the ALJ**

### Lincoln Medical and Mental Health Center

On February 4, 1999, Soto was brought to the emergency room at Lincoln Medical and Mental Health Center after he swallowed "about 10 pills because he was feeling bad." (R. 386.) Soto reported that he was "very depressed" since his wife left, and felt like he wanted to die.  (Id.) Attending psychiatrist Dr. Jorge Urbina diagnosed adjustment disorder, depressed mood and impulse

control disorder.  (R. 400-01.)  Soto was prescribed Zoloft and discharged after about a week of

inpatient treatment.  (R. 400.)

On October 20, 2003, Soto was admitted to the Lincoln Medical psychiatry

department.  (R. 390.)  He complained that he had "bouts of crying, anxiety, and sadness" that

"resulted in his inability 'to hold a job.'"  (R. 390.)  Soto stated that he had stopped taking the Prozac

he was prescribed, and instead self-medicated with heroin and marijuana.  (Id.)  At a follow-up

psychiatric evaluation on October 22, 2003, attending psychiatrist Brunhild Kring diagnosed Soto

with major depression and impulse control disorder, and noted that he had "no acute medical

problems."  (R. 397.)  Dr. Kring assigned Soto a Global Assessment of Functioning ("GAF") score

of 45.  (Id.)[1/]

On April 11, 2009, Dr. Michele Harper saw Soto after he slipped and injured his left

knee and foot.  (R. 328.)  An x-ray of Soto's left foot indicated a "[q]uestionable fifth metatarsal base

fracture."  (R. 326.)  An x-ray of Soto's left knee indicated "[s]mall suprapatellar joint effusion with

mild tricompartmental degenerative osteoarthritis."  (R. 310.)

**Narco Freedom**

Soto has been admitted to a methadone maintenance program at Narco Freedom, a

substance abuse diagnostic and treatment center, since October 26, 2006.  (R. 364.)  As part of the

program, Dr. Iean Denis conducted a physical examination of Soto on October 14, 2009.  (R. 366-

67.)  The results of the examination were normal.  (R. 367.)  Dr. Denis' diagnoistic impressions were

---

[1/]     A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment" in
         functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental
         Disorders ("DSM-IV") at 34 (4th ed. rev. 2000)).

chronic opioid dependence, diabetes mellitus and hypertension.  (R. 368.)  Dr. Denis opined that it was appropriate for Soto to continue methadone treatment.  (Id.)

Narco Freedom additionally conducted a mental status examination of Soto on October 14, 2009.  (R. 366.)  Soto's general appearance, dress, motor activity, speech, mood, content of thought, flow of thought, and interview behavior were normal.  (Id.)  Soto's concentration and insight were good, his memory was good/intact, his cognitive ability was intact, his affect appropriate and his judgment fair.  (Id.)  Soto was diagnosed with chronic opiate dependence, diabetes mellitus and hypertension. (Id.)  Soto was assessed with a GAF score of 70-72.  (Id.)[2]

**Federation Employment and Guidance Service ("FEGS")**

On October 16, 2009, Soto was evaluated by FEGS.  (R. 405-37.)  Soto reported that his daily activities were: "go on appointments, read, do chores, watch TV." (R. 425.)  Soto reported that he had "difficulty of finding employment due to his legal history (2 counts of homicide)."  (R. 436.)  Soto reported having "unbearable pain" in both legs. (R. 433.)  Dr. Fernando Diaz conducted a physical examination of Soto and found tenderness, swelling, hyperpigmentation and mild pitting edema[3] in Soto's legs.  (R. 433.)  Dr. Diaz diagnosed Soto with major depression disorder, diabetes mellitus, hypertension, obesity and opioid dependence.  (R. 435.)  Dr. Diaz noted that as to his depression, Soto had a "history of good response to treatment" but currently had "no regular

---

[2]    A GAF score of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well."  DSM-IV at 34.  A GAF score of 71-80 indicates "transient" symptoms and "no more than slight impairment in social, occupational, or school functioning."  Id.

[3]    "Edema" is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body."  Dorland's Illustrated Medical Dictionary at 593 (32d ed. 2012). "Pitting edema" is "edema in which the tissues show prolonged existence of the pits produced by pressure."  Id.

psychiatric follow-up" and recommended psychiatric treatment with psychopharmacology and supportive psychotherapeutic intervention. (R. 436.) Dr. Diaz referred Soto to Dr. Leggett at Bronx Lebanon Hospital for psychiatric treatment. (R. 443.)

**Bronx Lebanon**

The medical evidence shows that after 2009, Soto was treated primarily at Bronx Lebanon. (R. 538-970.)

On March 31, 2009, Dr. Bhavna Balar saw Soto for an evaluation of rectal bleeding. (R. 680.) Dr. Balar noted that Soto was obese, weighing 260 pounds with a body mass index of 40. (R. 680.)

On May 4, 2009, Soto was seen at the emergency room for knee and leg pain from a fall three weeks prior. (R. 336-37, 682-83.) Soto rated the pain as a nine on a ten point scale and described the pain as "constant; sharp; stabbing." (R. 683.) Soto stated that the swelling in his knee had increased since his April 11, 2009 injury. (R. 336.) A review of Soto's symptoms demonstrated that muscle strength was 1/5 in his left leg and 3/5 in his right leg. (R. 345.) Ultrasound imaging and a doppler evaluation of Soto's venous structures showed no evidence of deep vein thrombosis ("DVT"),[4] but pitting edema again was noted on Soto's calves. (R. 357.) In his plan of care, Dr. Rubi Valerio noted that Soto had cellulitis[5] on a background of chronic venous stasis,[6] diabetes

---

[4]    "Deep vein thrombosis" is the formation, development, or presence of a stationary blood clot along the wall of one or more deep veins, usually of the lower limb. Dorland's Illustrated Medical Dictionary at 1923.

[5]    "Cellulitis" is "an acute, diffuse, spreading, edamatous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle." Dorland's Illustrated Medical Dictionary at 325.

[6]    "Venous stasis" is "cessation or impairment of venous flow." Dorland's Illustrated Medical
(continued...)

mellitus type two and hypertension.  (R. 351.)  Dr. Valerio further noted that DVT was "ruled out."

(Id.)

On October 28, 2009, Soto saw Dr. Neal Blitz for a diabetic podiatric evaluation.

(R. 651.)  Soto complained of a painful callus, thick painful toenails and a rash on the bottom of his

foot.  (Id.)  Dr. Blitz assessed diabetes mellitus, tinea pedis[7] and onychomycosis.[8]  (Id.)

At a follow-up podiatric exam on March 1, 2010, Soto reported that the prescription

topical cream he was given was "helping."  (R. 658.)  Dr. Jonathan Margolin assessed the same

conditions as Dr. Blitz, with the addition of an ingrowing toenail.  (Id.)  Dr. Margolin noted that

Soto's range of motion was intact, with full muscle power bilaterally.  (Id.)

On March 7, 2010, Dr. Christopher Leggett, a psychologist, completed a Treating

Physician's Wellness Plan Report for Soto.  (R. 374-75.)  Dr. Leggett diagnosed major depressive

disorder.  (R. 374.)  Dr. Leggett's clinical findings were depressed mood and energy, anxiety and

history of auditory hallucinations.  (Id.)  Dr. Leggett noted that Soto had been off his medication for

one month, but showed significant improvement while on Cymbalta, Elavil, Abilify and Seroquel.

(Id.)  Dr. Leggett indicated that Soto was "temporarily" unemployable for three months.  (R. 375.)

On July 12, 2010, at a follow-up podiatric exam, Soto complained that he had "more

back pain and numbness in his feet."  (R. 584.)  Dr. Margolin noted that Soto had "some slight"

---

[6]     (...continued)
        Dictionary at 1766.

[7]     "Tinea pedis" is any of a variety of dermaphytoses involving the feet.  It is popularly called
        athlete's foot and ringworm.  Dorland's Illustrated Medical Dictionary at 1929-30.

[8]     "Onychomycosis" is a "fungal infection of the toenails or fingernails."  Dorland's Illustrated
        Medical Dictionary at 1322.

erythema[9/] but no edema. (Id.) Dr. Margolin's orthopedic evaluation indicated that Soto had an intact range of motion and full muscle power.  (Id.)  Dr. Margolin again assessed diabetes mellitus, tinea pedis, onychomycosis and an ingrowing toenail.  (Id.)  Dr. Margolin referred Soto to Dr. Auerbach for evaluation.  (Id.)

Also on July 12, 2010, Dr. Irina Benyaminova treated Soto for back and leg pain. (R. 518.)  Soto reported that the pain radiated to his left leg when he was sitting, standing and lying down.  (Id.)  Dr. Benyaminova noted that Soto was a smoker, and had diabetes mellitus and hypertension.  (Id.)

On July 30, 2010, Soto saw Dr. Peter Lesniewski and complained of numbness in his legs and pain in his feet, which he stated was worse with walking.  (R. 585.)  Dr. Lesniewski noted that Soto was in "mild distress."  (Id.)  Dr. Lesniewski further noted that Soto had tenderness in the mid-foot joints, and that an x-ray confirmed an early Charcot joint.[10/]  (Id.)  Dr. Lesniewski prescribed Gabapentin and recommended that Soto quit smoking.  (Id.)

At an exam on August 20, 2010, Soto reported that he had difficulty walking, was getting "quite numb" and had pain with a "very, very annoying . . . burning sensation."  (R. 590.) Dr. Lesniewski noted vascular changes for venous stasis in Soto's lower extremities, and prescribed Vicodin for pain.  (Id.)

On August 26, 2010, Soto was seen at the emergency room with complaints of anxiety, restlessness, chest tightness, insomnia and mild shortness of breath.  (R. 606, 608.)  Soto

---

[9/]     "Erythema" is "redness of the skin produced by congestion of the capillaries."  Dorland's Illustrated Medical Dictionary at 643.

[10/]     A "charcot foot" is "the deformed foot seen in tabetic arthropathy."   Dorland's Illustrated Medical Dictionary at 728.

reported that he had taken cocaine that morning (R. 607), and his toxicology screening was positive for cocaine and methadone (R. 612).  Soto's discharge diagnosis was cocaine abuse.  (Id.)

On October 29, 2010, Soto was seen at the emergency room with complaints of sweating, occasional rigors, coughing up sputum, left leg, foot and generalized body pain, and chronic pain in his left toe. (R. 617-18, 622.)  Soto was admitted for treatment of pneumonia.  (R. 624-39.)  Soto was not in acute or respiratory distress, his cardiovascular rate was normal, and he was noted to be alert, oriented, and  independent in his activities of daily living.  (R. 621.)  A review of Soto's symptoms indicated chills and a cough, but no arm, leg or back pain and no joint swelling.  (R. 622.)  Soto's diagnoses on admission were pneumonia, psychiatric hallucination, hypertension, drug dependency and uncontrolled diabetes.  (R. 639.)  Soto was discharged on November 2, 2010, without restrictions on lifting or returning to work.  (R. 636-37.)

On March 21, 2011, Dr. Margolin in podiatry treated Soto.  (R. 642-43.)  Dr. Margolin again assessed diabetes mellitus, tinea pedis, onychomycosis and an ingrowing toenail. (R. 643.)  Upon orthopedic evaluation, Soto's range of motion was intact and his muscle power was full bilaterally.  (Id.)  Dr. Margolin performed an aseptic debridement of Soto's toenails, and "re-educated" him about diabetic foot care.  (Id.)

On May 10, 2011, Soto had an appointment with Dr. Leggett.  (R. 581.)  Soto reported seeing shadows, irritable mood, poor sleep and passive suicidal ideation.  (Id.)  Soto had been out of his psychiatric medication for two weeks.  (Id.)  Dr. Leggett noted that Soto needed to restart his existing medication regimen (Abilify, Effexor XR and Ambien), and prescribed Remeron as well.  (Id.)

On May 19, 2011, Dr. Anele Slezinger treated Soto for pain in his lower extremities. (R. 700-02.)  Soto rated the pain as moderate, and described it as continuous "stabbing needles."

(R. 700.)  Dr. Slezinger noted that Soto was obese and had diabetes mellitus.  (Id.)  Dr. Slezinger observed that Soto had bilateral erythema, not warm to palpation and no joint swelling.  (R. 702.) Dr. Slezinger diagnosed neuropathy in diabetes[11] and diabetic peripheral vascular disease.  (Id.)  Dr. Slezinger prescribed Lyrica for pain, ordered an arterial doppler and a vascular consultation.  (R. 701-02.)

On June 9, 2011, Dr. Hanasoge Girishkumar examined Soto and observed pitting edema on both lower extremities from below the knee to the ankle region.  (R. 703.)  Soto complained that he had pain, swelling and skin discoloration in his lower extremities for a year and a half.  (Id.)  Dr. Girishkumar observed that Soto had "no signs of dilation of veins, ulcers or heel ulcers."  (Id.)  Dr. Girishkumar diagnosed Soto with chronic venous insufficiency[12] and prescribed compression stockings.  (Id.)  At a follow-up examination on July 21, 2011, Dr. Girishkumar noted that Soto was compliant with wearing compression stockings and his swelling was "improved."  (R. 707.)

On August 2, 2011, Soto had a psychiatric follow-up appointment with Dr. Leggett.  (R. 711-13.)  Soto reported that he was depressed and had poor sleep.  (R. 711.)  Dr. Leggett noted that Soto had been out of his medication for two months and needed to restart his regimen.  (Id.)

On August 2, 2011, Dr. Slezinger saw Soto for a follow-up examination.  (R. 708-11.)  Dr. Slezinger observed swelling and "minimal pitting edema" in Soto's lower limbs.  (R. 710.)

---

[11]    "Diabetic neuropathy"is "any of several clinical types of polyneuropathy seen with diabetes mellitus."  Dorland's Illustrated Medical Dictionary at 1268.

[12]    "Venous insufficiency" is "inadequacy of the venous valves and impairment of the venous return from the lower limbs (venous stasis), usually characterized by edema, warmth and erythema, particularly of the lower third of the extremity."  Dorland's Illustrated Medical Dictionary at 945.

Dr. Slezinger noted that Soto was "clinically improved," and lowered his dosage of Norvasc to prevent further increase in his lower extremity swelling.  (R. 709.)  Dr. Slezinger ordered diabetes blood work and a nutrition referral for obesity.  (R. 711.)

On August 23, 2011, upon physical examination, Dr. Slezinger observed "no pedal edema." (R. 715.) Dr. Slezinger adjusted Soto's diabetes medication, and again ordered a nutrition consultation.  (R. 716.)

On September 15, 2011 Dr. Girushkumar noted that Soto was compliant with wearing compression stockings.  (R. 716.)  Dr. Girushkumar observed skin discoloration and pitting edema, but Soto's "swelling h[ad] improved."  (Id.)  Soto had no "dilation of veins, ulcers or heel ulcers." (Id.)

On October 25, 2011, Soto told  Dr. Leggett that he was dissatisfied with his life, living arrangements and lack of social and vocational activity.  (R. 722.)  Dr. Leggett gave Soto a referral for supportive counseling to improve his social adjustment and vocational performance, and increased his Remeron dosage.  (Id.)

On December 1, 2011, Soto was admitted to the emergency room for chest pain and hyperglycemia. (R. 916-18.)  An echocardiogram showed normal sinus rhythm, left axis deviation,

inferior infarct[13/] and possible lateral ischemia.[14/]    (R. 923-24.)    Soto was diagnosed with

uncontrolled diabetes mellitus, tachycardia[15/] and hypoxia.[16/]    (R. 914.)

On January 6, 2012, Dr. Slezinger treated Soto.    (R. 538-41.)    Upon physical

examination, Dr. Slezinger noted that Soto had limited flexion, limited lateral left and right bend,

and limited left and right rotation in his back.    (R. 540.)    Dr. Slezinger also observed "lower

extremity skin changes secondary to venous insufficiency."    (Id.)    Dr. Slezinger opined that Soto's

diabetes and blood pressure were "not under control."    (R. 541.)    Dr. Slezinger referred Soto to

gastroenterology, ordered a home blood pressure monitor for him and advised that a nurse would

visit him at home to assist with diabetes maintenance.    (Id.)

On January 17, 2012, Soto had a psychiatric appointment with Dr. Leggett.    (R. 542.)

Soto reported residual mood swings, which Dr. Leggett opined were likely due to poor glycemic

control.    (Id.)    Dr. Leggett noted that Soto "sustained benefit[s]" from his medication regimen, and

reinforced his "efforts to improve glycemic control for optimal physical and mental health."    (Id.)

Dr. Leggett adjusted Soto's medication regimen due to changes in Medicaid.    (Id.)

On February 13, 2012, Dr. Slezinger noted that Soto's glucose level and blood

pressure were elevated, and prescribed insulin.    (R. 544.)    Soto complained of shortness of breath,

---

[13/]    "Infarct" is "an area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area, most commonly by a thrombus or embolus."    Dorland's Illustrated Medical Dictionary at 934.

[14/]    "Ischemia" is "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."    Dorland's Illustrated Medical Dictionary at 961.

[15/]    "Tachycardia" is "excessive rapidity in the action of the heart."    Dorland's Illustrated Medical Dictionary at 1867.

[16/]    "Hypoxia" is "a reduction of oxygen supply to tissue below physiological levels."    Dorland's Illustrated Medical Dictionary at 908.

and Dr. Slezinger referred him to the cardiology and pulmonary departments.  (R. 546.)  Dr. Slezinger again opined that Soto's diabetes and blood pressure were "not under control."  (R. 547.)

On March 5, 2012, Dr. Slezinger treated Soto for complaints of mild intermittent pain in his lower left quadrant.  (R. 547-50.)  Soto described the pain as "cramping."  (R. 548.)  Dr. Slezinger increased Soto's diabetes medication and advised him to go to the emergency room if his pain increased or became constant.  (R. 549.)

On June 5, 2012, Soto had a psychiatric appointment with Dr. Leggett.  (R. 550-52.)  Soto complained of "irritability, anxiety, poor sleep."  (R. 550.)  Dr. Leggett noted that Soto had been out of medication for one month "due to problems with Medicaid" and needed to restart his regimen.  (Id.)

On June 20, 2012, Dr. Chidi Ogbanna at the podiatry clinic treated Soto.  (R. 554-56.)  Dr. Ogbanna assessed diabetes mellitus, onychomycosis, keratoderma,[17] bilateral flexible pes planus and xerosis.[18]  (R. 556.)  Dr. Ogbanna performed an asceptic nail debridement and sharp excisional debridement of keratoses.  (Id.)  Dr. Ogbanna instructed Soto to check his feet daily, provided orthotics and discussed diabetic foot care with him.  (Id.)

On August 7, 2012, Dr. Leggett treated Soto.  (R. 566-68.)  Dr. Leggett noted that Soto was "stable at his psych baseline" and had "return[ed] early to get a letter stating that he can't work."  (R. 566.)  Dr. Leggett prescribed sleep medication, advised Soto to enroll in the FEGS WeCare program and declined to provide a letter stating that Soto was unable to work.  (Id.)

---

[17]   "Keratoderma" is a "horny skin or covering," or "hypertrophy of the statrum coreum of the skin."  Dorland's Illustrated Medical Dictionary at 980.

[18]   "Xerosis" is "abnormal dryness."  Dorland's Illustrated Medical Dictionary at 2087.

Also on August 7, 2012, Soto saw Dr. Russell Perry.  (R. 568-72.)  Dr. Perry noted that Soto continued to complain of low back pain, but had not made an appointment for physical therapy.  (R. 568.)  Soto requested a letter stating that he was unable to work, and Dr. Perry advised that he could not write a letter unless Soto attempted physical therapy for his lumbago.[19/]  (R. 572.)  Dr. Perry further indicated that Soto's glucose level was "much improved" on his new medication.  (Id.)  Dr. Perry observed: "[P]atient very hostile asking for a form not to work to be filled out, patient in my opinion would benefit from clerical job."  (R. 572.)

**Consultative Examinations**

**Consultative Physician Dr. Dipti Joshi**

On July 28, 2010, consultative internist Dr. Dipti Joshi examined Soto.  (R. 468-72.)  Dr. Joshi identified Soto's chief complaints as hypertension, diabetes with neuropathic symptoms in the left first toe, back pain with sitting or standing too long, depression and anxiety.  (R. 468.)  Soto stated that he stopped using cocaine in June 2010 but continues to use heroin "intermittently."  (R. 469.)  Soto reported that he cooked, showered and dressed daily, cleaned three times a week, did laundry weekly, shopped twice a month, and watched television and listened to the radio.  (Id.)  Soto's height was sixty-eight inches, and his weight was 252 pounds.  (Id.)  Dr. Joshi noted that Soto was obese, but appeared to be "in no acute distress."  (Id.)  Soto's gait and stance were normal, he was able to walk on his heels and toes without difficulty, and his squat was full.  (Id.)  Soto did not use an assistive device, and did not require help to change or get on and off the exam table.  (R. 470.)  Dr. Joshi observed that Soto's cervical spine showed "full flexion, extension, lateral flexion

---

[19/]     "Lumbago" is "a nonmedical term for any pain in the lower back."  Dorland's Illustrated Medical Dictionary at 1076.

bilaterally, and full rotary movement bilaterally." (Id.) Soto had no scoliosis,[20] kyphosis,[21] or abnormality in the thoracic spine, and his lumbar spine likewise showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (Id.) Soto's straight leg raising tests were negative bilaterally. (Id.) Soto's neurologic examination showed physiologic and equal deep tendon reflexes in his upper and lower extremities, but decreased sensation in the left great toe. (R. 471.) Soto's extremities were normal, except for trophic changes bilaterally in his lower extremities. (Id.) Soto's hand and finger dexterity were intact, with full grip strength bilaterally. (Id.)

Dr. Joshi diagnosed Soto with obesity, a history of substance abuse (and current use), hypertension, diabetes, neuropathic symptoms in his great left toe, intermittent low back pain, depression, anxiety, and a history of left lower extremity blood clot, although he could not identify whether the blood clot had been superficial or deep. (R. 471.) Dr. Joshi determined that Soto's prognosis was "fair." (Id.) Dr. Joshi opined that because of Soto's active heroin use, "he should avoid working from heights, operating heavy machinery, or driving a motor vehicle." (Id.) Dr. Joshi further opined that Soto had a "mild limitation to walking, climbing, and standing and should have [an] evaluation for decreased sensation in his toe which could be secondary to the diabetes." (Id.) Dr. Joshi recommended that Soto have his blood pressure evaluated, and referred him for a psychological evaluation. (Id.)

---

[20]   "Scoliosis" is "an appreciable lateral deviation in the normally straight vertical line of the lateral spine." Dorland's Illustrated Medical Dictionary at 1681.

[21]   "Kyphosis"is "an area of the vertebral column that is convex." Dorland's Illustrated Medical Dictionary at 992.

**Consultative Psychologist Dr. Dmitri Bougakov**

On July 28, 2010, consultative psychologist Dr. Dmitri Bougakov examined Soto. (R. 464-67.) Soto complained that he could not work due to "back pain, hypertension, and diabetes." (R. 464.) Soto reported that he had difficulty falling asleep, "sad moods, crying spells, loss of interests, low energy, concentration difficulties, a diminished sense of pleasure, and restlessness." (Id.) Soto reported no cognitive symptomology. (Id.) Soto stated that he had last used heroin one year ago and marijuana two months ago. (R. 464-65.) Dr. Bougakov noted that Soto's cocaine status was unclear. (R. 465.) Soto reported that he performed daily chores independently, took public transportation and could manage money. (R. 466.) Soto stated that he enjoyed "watching TV and listening to the radio." (Id.)

Dr. Bougakov observed that during the evaluation Soto "was cooperative and related adequately." (R. 465.) Dr. Bougakov described Soto as overweight, with appropriate eye contact, and normal gait, posture and motor behavior. (Id.) Soto "presented with some labored breathing." (Id.) Dr. Bougakov found that Soto's expressive and receptive language were adequate, and his thought processes were coherent and goal directed. (Id.) Soto's attention and concentration were "impaired due to opioid dependence." (Id.) Although Soto was able to count and perform simple calculations, he was unable to do "serial 3s." (Id.) Dr. Bougakov found that Soto's insight and judgment were fair, and his recent and remote memory skills intact. (R. 466.) Soto's intellectual functioning was "in the average to below average range" with a "somewhat limited" fund of general information. (Id.)

Dr. Bougakov opined that Soto could "follow and understand simple directions and instructions, . . . perform simple tasks, . . . maintain attention and concentration, and . . . maintain a regular schedule on a limited basis." (R. 466.) Dr. Bougakov opined that Soto was "somewhat

limited in his ability to learn new tasks and perform complex tasks[,] . . . make appropriate decisions, relate adequately with others, and deal with stress." (Id.) Dr. Bougakov concluded that the results of the examination "appear to be consistent with substance abuse problems, and this may significantly interfere with [Soto's] ability to function on a daily basis." (Id.) Dr. Bougakov diagnosed Soto with opioid dependence, cocaine and cannabis abuse, and substance induced mood disorder on Axis I; and diabetes, hypertension and low back pain on Axis III. (R. 466-67.)

Dr. Bougakov recommended that Soto continue his current psychiatric treatment, and noted that he could benefit from "more intensive" drug treatment. (R. 467.) Soto's prognosis was "guarded given the fact that [he] is an active heroin user." (Id.)

### Evaluation of Medical History by Psychologist E. Kamin

On August 11, 2010, psychologist Dr. E. Kamin reviewed Soto's medical records. (R. 473-86.) Dr. Kamin concluded that Soto had a substance-induced mood disorder that did not precisely satisfy the diagnostic criteria of Section 12.04, Affective Disorders (R. 476), and cocaine and cannabis abuse and opioid dependence under Section 12.09, Substance Addiction Disorders (R. 481). Dr. Kamin found that Soto had a mild restriction on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of deterioration. (R. 483.) Dr. Kamin did not find that the evidence established the presence of Section "C" criteria. (R. 484.)

Dr. Kamin opined that Soto was not significantly limited in his ability to remember locations and work like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, perform activities within a schedule,  maintain regular attendance and be punctual within customary tolerances, or work in coordination with or proximity to others without being distracted by them. (R. 494.) Dr. Kamin further opined that Soto was not

significantly limited in his ability to ask simple questions and request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently.  (R. 497.)  Dr. Kamin opined, however, that Soto was moderately limited in the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision and complete a normal workday and workweek without interruption from psychologically based symptoms.  (R. 494, 497.)  Dr. Kamin further opined that Soto was moderately limited in his ability to interact appropriately with the general public, accept instruction and respond appropriately to criticism and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 494, 497.)  Dr. Kamin concluded that Soto's allegation of disability was not fully supported by the evidence of record, and that he had the "residual functional capacity for simple task work."  (R. 493.)

### **Physical Residual Functional Capacity Assessment**

C. James conducted a physical residual capacity assessment on August 11, 2010.  (R. 488-92.)[22/]  James found that Soto had no postural, manipulative, visual, communicative or environmental limitations.  (R. 489-90.)  James indicated that Soto could occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds, with unlimited capacity for pushing or pulling within those parameters.  (R. 487.)  James further indicated that Soto could sit and stand for

---

[22/]   It is unclear from the record whether James is a medical consultant or a single decision maker.  (R. 492.)  In either event, ALJ Barr did not reference James' findings in her decision, and thus they did not affect the outcome of this case.  (See R. 6-21.)

about six hours in an eight hour work day.  (Id.)  James concluded that Soto's allegation of disability was not fully supported by the medical evidence of record, and that Soto retained the "residual function capacity for light level work."  (R. 491.)

**Vocational Expert Testimony**

Vocational expert Vaughn testified as to the national and regional job markets at Soto's hearing before ALJ Barr on October 2, 2012.  (R. 75-86.)  ALJ Barr asked Vaughn three hypothetical questions about whether work existed in significant numbers in the national economy. (R. 79-83.)

In the first hypothetical, ALJ Barr asked Vaughn to assume "a person of [Soto's] age, education, and work experience, who was able to perform work at the sedentary level."  (R. 79.) The person would need to avoid "all exposure to heights, operating machinery, or driving" and "would be limited to simple, unskilled work."  (Id.)  The person would also be limited to low stress work, meaning no assembly line work and only occasional decision making or changes in work setting.  (Id.)  The person in the first hypothetical could have only occasional contact with the general public.  (Id.)  Vocational expert Vaughn testified that a person with these limitations could perform the jobs addressing clerk, lens inserter, and buckler and lacer. (R. 81.)

ALJ Barr next presented a hypothetical in which a person with the same restrictions as in the first hypothetical would additionally need to alternate between sitting and standing while working.  (R. 82.)  Vocational expert Vaughn testified that based on his experience and understanding of how the jobs he identified were performed, the sit/stand restriction would eliminate work as an addressing clerk, but  the positions of lens inserter and buckler, lacer would be available to a person who sat or stood "at their own volition" while working.  (R. 82-83.)

Finally, ALJ Barr asked vocational expert Vaughn to assume that a person with all the restrictions listed in the prior hypotheticals would also need to miss one day of work per month. (R. 83.)  ALJ Vaughn testified that depending on the work environment and the supervisor, one absence per month would be tolerated, but he qualified that it would erode the number of positions available, and that more than two days a month would mean no available jobs.  (Id.)

**ALJ Barr's Decision**

On December 19, 2012, ALJ Barr issued a written decision denying Soto's application for DIB and SSI benefits.  (R. 6-21.)

ALJ Barr applied the appropriate five step legal analysis. (R. 10-21.) First, ALJ Barr found that Soto "ha[d] not engaged in substantial gainful activity since November 15, 2009, the alleged onset date."  (R. 12.)  Second, ALJ Barr found that Soto had the following severe impairments: "lumbar spine impairment; diabetes mellitus with chronic venous insufficiency of the lower extremities; hypertension; shortness of breath with a history of pneumonia; obesity; depression; and a history of polysubstance abuse, presently in remission."  (Id.)  Third, ALJ Barr determined that Soto did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (R. 12-13.)

ALJ Barr determined that Soto had the residual functional capacity "to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)" with the limitations that he must avoid "all exposure to heights, operating machinery, and driving," and perform "simple, unskilled work in a low-stress environment" with only occasional decision making or changes in work setting and no assembly line-type work. (R. 14.)  ALJ Barr further specified that the position had to involve "only occasional face-to-face interaction with the general public and only occasional contact with co-workers."  (R. 14.)  In making this determination, ALJ Barr concluded that the

medical evidence of record did not "describe the same degree and persistence of mental and physical impairments that [Soto] alleged during the hearing."  (R. 15.)   ALJ Barr reviewed Soto's examinations by FEGS and Narco Freedom, Dr. Leggett's treatment notes, and the reports of Dr. Bougakov and Dr. Kamin and found that Soto's mental impairments "required treatment only once every two to three months, with few active symptoms so long as he was compliant with his mediation regimen." (R. 15-16.)  In terms of Soto's physical impairments, ALJ Barr found that the medical evidence of record showed treatment that was "largely routine and outpatient in nature, and generally controlled on a prescription drug regimen."  (R. 17.)

ALJ Barr made a credibility determination, finding that Soto's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment."  (R. 18.)   ALJ Barr supported her credibility finding with Soto's testimony and medical evidence from the administrative record.  (R. 18-20.)

At the fourth step, ALJ Barr found that Soto was unable to perform his past relevant work as a receiving clerk, stock clerk, janitor and groundskeeper.  (R. 20.)  At the fifth and final step, ALJ Barr found that considering Soto's "age, education, work experience, and residual functional capacity, [Soto] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 21.)  Therefore, ALJ Barr determined that Soto was not "under a disability, as Defined in the Social Security Act, from November 15, 2009."  (Id.)

**Appeals Council Decision**

On February 18, 2013, Soto, by his non-attorney representative Victor Ferrer, requested review of ALJ Barr's decision.  (R. 4-5.)  Ferrer wrote: "Mr. Soto, served 2 prison terms: convicted of 2 respective murders at two different times.  He has an impulse control disorder; an

institutionalized mentality.  (Violent)  He is illiterate.  Diabetes has affected his legs & feet."  (R.

4.)  The Appeals Council denied review of Soto's claim on July 8, 2014, and thus ALJ Barr's

decision became the Commissioner's final decision.  (R. 1-3.)

**Additional Evidence Before The Court**

Attached to Soto's motion for judgment on the pleadings are medical records which

were not submitted to the ALJ or Appeals Council, and thus are not part of the administrative record.

(See Dkt. No. 20: Soto Br. Ex. A: MRI of Lumbar Spine.)   The new medical records show that on

March 1, 2013, Bronx Lebanon performed a magnetic resonance imaging ("MRI") scan of Soto's

lumbar spine.  (MRI of Lumbar Spine at 1.)  The MRI impressions note that Soto had "multilevel

degenerative changes noted throughout the lumbar spine, most prominent at L5-S1."  (MRI of

Lumbar Spine at 2.)  Although there was "no significant central canal stenosis at any of the levels,"

the left neuroformina at L5-S1 had "mild to moderate narrowing . . . due to lateral disc osteophyte

complex."  (Id.)  The MRI indicated severe bilateral recess narrowing at the L5-S1 level as well.

(Id.)   The MRI findings identify "[n]o osseous expansion, epidural disease or paraspinal

abnormality" and intact "[n]erve roots of the cauda equina," but note "mild dependent edema within

the posterior paraspinal subcutaneous soft tissues." (MRI of Lumbar Spine at 1.)

**ANALYSIS**

**I.     THE APPLICABLE LAW**

**A.      Definition Of Disability**

A person is considered disabled for Social Security benefits purposes when he is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[23/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[24/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

---

[23/] See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[24/] See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[25/]

**B.    Standard Of Review**

      A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[26/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[27/]

      The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>,

---

[25/]    <u>See</u>, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[26/]    <u>See also</u>, <u>e.g.</u>, <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

[27/]    <u>See also</u>, <u>e.g.</u>, <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[28/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[29/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial

---

[28/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[29/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[30/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[31/]

---

[30/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[31/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

C.      **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

### D.    The ALJ's Duty To Develop The Record

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record:

> [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord

>Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on other grounds],
>416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also
>Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se
>claimant). Social Security disability determinations are "investigatory, or
>inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation
>marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and
>develop the arguments both for and against the granting of benefits." Id. (internal
>quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009). This duty is heightened when a claimant

proceeds pro se.  See, e.g., Moran v. Astrue, 569 F.3d at 113; Hamilton v. Colvin, 10 Civ. 9641,

2013 WL 3814291 at *13 (S.D.N.Y. July 23, 2013).

## II.   ALJ BARR SUFFICIENTLY DEVELOPED THE RECORD

Soto argues that in assessing his residual functional capacity ("RFC") ALJ Barr

failed adequately to develop the record.  (Dkt No. 20: Soto Br. at 14-15.) Because legal error

warrants remand, Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999), the Court will address the

correctness of the legal standards applied first.

ALJ Barr's conclusion that Soto had the RFC to meet the demands of sedentary work

was based on the medical records from Lincoln Medical and Bronx Lebanon, the opinions of

consultative examiners Dr. Joshi and Dr. Bougakov, physical examinations by FEGS and Narco

Freedom, Dr. Kamin's review of the administrative record and Soto's testimony.  (R. 14-20.)  Soto

does not contend that there are any gaps or deficiencies in the record, or treatment notes that ALJ

Barr failed to obtain.  (Soto Br. at 14-15.)  Indeed, the medical record from Bronx Lebanon consists

of more than three years of detailed treatment notes from Soto's physicians and mental health

professionals.  (See pages 7-15 above.)  "'[W]here there are no obvious gaps in the administrative

record, and where the ALJ already possesses a "complete medical history," the ALJ is under no

obligation to seek additional information in advance of rejecting a benefits claim.'" Swiantek v.

Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (quoting Rosa v. Callahan, 168 F.3d 72,

79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996))).[32/]

      Accordingly, the Court finds that ALJ Barr properly developed the record.

## III.   ALJ BARR'S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

### A.   Soto Was Not Engaged In Substantial Gainful Activity

      The first inquiry is whether Soto was engaged in substantial gainful activity after his

application for DIB and SSI benefits.  "Substantial gainful activity" is defined as work that involves

"doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or

profit." 20 C.F.R. § 404.1510.  ALJ Barr's conclusion that Soto did not engage in substantial gainful

activity during the applicable time period (see page 21 above) is not disputed by Soto or the

Commissioner.  (See generally Dkt. Nos. 13 & 22: Comm'r Brs.; Dkt. No. 20: Soto Br.)

### B.   Soto Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

      The second step of the analysis is to determine whether Soto proved that he had a

severe impairment or combination of impairments that "significantly limit[ed his] physical or mental

ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities

is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).

"Basic work activities" include:

---

[32/]    See also, e.g., Ramos v. Comm'r of Soc. Sec., 13 Civ. 6561, 2015 WL 708546 at *18 (S.D.N.Y. Feb. 4, 2015) (ALJ had no further obligation to develop the record where the medical record from the treating clinic was "extensive, including more than two years of consistent treatment notes."); Matos v. Colvin, 13 Civ. 4525, 2014 WL 3746501 at *9 (S.D.N.Y. July 30, 2014) (ALJ properly fulfilled duty to develop the record where he questioned claimant thoroughly, solicited testimony from medical and vocational experts and admitted voluminous submissions from physicians.).

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[33/]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

---

[33/]   Accord, e.g., Whiting v. Astrue, No. Civ. A. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Barr determined that Soto had the following severe impairments: hypertension, diabetes mellitus with chronic venous insufficiency of the lower extremities, shortness of breath with a history of pneumonia, obesity, depression, a history of polysubstance abuse, presently in remission, and an impairment of the lumbar spine.  (R. 12; see page 21 above.)  ALJ Barr's finding regarding the severity of Soto's impairments also is uncontested (Dkt. No. 13: Comm'r Br. at 16), and the Court therefore proceeds to the third step of the five-step analysis.

### C.    Soto Did Not Have Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Soto had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Barr found that notwithstanding Soto's severe lumbar spine impairment, diabetes mellitus with chronic venous insufficiency of the lower extremities, hypertension, shortness of breath with a history of pneumonia, obesity, depression and history of polysubstance abuse, Soto "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 12.)  ALJ Barr analyzed Soto's diabetes and resulting complications under Listing 4.11 for chronic venous

insufficiency and Listing 9.00 for endocrine disorders.  (R. 12)  ALJ Barr found that Soto did not

satisfy the requirements for either Listing, as he "has not had recurrent or persistent ulcerations not

healed in spite of at least 3 months of prescribed treatment, and has not had repeated episodes of

diabetic ketoacidosis, chronic hyperglycemia, or hypoglycemia." (R. 12.) ALJ Barr determined that

Soto's back impairment "does not satisfy the requirements of Listing 1.04A as he has not exhibited

each of the necessary neurological deficits." (Id.) ALJ Barr further found that Soto did not satisfy

Listing 3.00 for the respiratory system, or Listing 4.00 for the cardiovascular system. (Id.) Finally,

ALJ Barr found that Soto's obesity "does not appear to further impact his condition to the extent that

the Listing requirements are medically equaled." (Id.)

ALJ Barr evaluated Soto's mental impairments against the criteria in Listing 12.04,

affective disorders, and Listing 12.09, substance addiction disorders.  (R. 13.)  ALJ Barr found that

Soto did not satisfy the "'paragraph B'" criteria for mental impairments because he did not have "at

least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation,

each of extended duration."  (R. 13.)  Additionally, ALJ Barr found that Soto did not satisfy the

"paragraph C" criteria for mental impairments because he did not have

> repeated episodes of decompensation, a residual disease process resulting in such
> marginal adjustment that even minimal increases in mental demands or changes in
> the environment would be predicted to cause him to decompensate, or a current
> history of 1 or more years' inability to function outside a highly supportive living
> arrangement.

(R. 14.)

Soto is represented by experienced counsel and does not argue that any of his

impairments meet or equal a listed condition.  (See generally Dkt No. 20: Soto Br.)

Soto does argue, however, that ALJ Barr's determination that he had the RFC to sit

for the prolonged periods of time required to perform sedentary work "cannot be sustained" due to

his chronic venous insufficiency.  (Dkt. No. 20: Soto Br. at 15.)  Sedentary work is the least

demanding job classification–a person who can perform light, medium, heavy or very heavy work

is presumed able to do sedentary work.  See 20 C.F.R. § 404.1567(b)-(e).  In arguing that his chronic

venous insufficiency prevents him performing sedentary work, Soto thus argues that he is unable

to perform work at any classification, i.e., that he is disabled.  (See Soto Br. at 15.)

> Chronic venous insufficiency qualifies as a disabling condition only when it is:
>
> of a lower extremity with incompetency or obstruction of the deep venous system and one of the following:
>
> A. Extensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip.
>
> OR
>
> B. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.11 (citation omitted).  Although Dr. Girishkumar diagnosed

Soto with chronic venous insufficiency on June 9, 2011 (see page 11 above), ALJ Barr found that

Soto's chronic venous insufficiency did not meet the requirements of Listing 4.11 because Soto has

not had "recurrent or persistent ulcerations not healed in spite of at least 3 months of prescribed

treatment."  (R. 12.)  This finding is supported by the medical record.  After diagnosing Soto's

chronic venous insufficiency, Dr. Girishkumar repeatedly noted that Soto had no sign of "ulcers or

heel ulcers."  (See pages 11, 12 above.)

ALJ Barr did not address the criteria for chronic venous insufficiency identified in

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.11(A), but there is no evidence in the record to support the

presence of brawny edema, required for that Listing.  Brawny edema is defined as

swelling that is usually dense and feels firm due to the presence of increased connective tissue; it is also associated with characteristic skin pigmentation changes. It is not the same thing as pitting edema. Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable. <u>Pitting edema does not satisfy the requirements of 4.11A.</u>

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.00(G)(3) (emphasis added). Numerous doctors noted that

Soto had bilateral pitting edema (<u>see</u> pages 6, 7, 11, 12 above), but pitting edema is insufficient to

satisfy the requirements of section 4.11(A) of Appendix 1, and the medical record makes no mention

of brawny edema. ALJ Barr was entitled to rely on that absence of evidence. <u>See</u>, <u>e.g.</u>, <u>Salvaggio</u>

v. <u>Apfel</u>, 23 Fed. App'x 49, 51 (2d Cir. 2001) (lack of medical evidence supports the ALJ's

determination that plaintiff was not disabled); <u>O'Connor</u> v. <u>Shalala</u>, No. 96-6215, 111 F.3d 123

(table), 1997 WL 165381 at *1 (2d Cir. Mar. 31, 1997) ("the Commissioner is also entitled to rely

on the absence of contemporaneous evidence of the disability"); <u>Diaz</u> v. <u>Shalala</u>, 59 F.3d 307, 315

(2d Cir. 1995); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1553 (2d Cir. 1983) (Commissioner is "entitled

to rely not only on what the [medical] record says, but also on what it does not say"); <u>Johnston</u> v.

<u>Colvin</u>, 13 Civ. 2710, 2015 WL 657774 at *5 n.3 (S.D.N.Y. Feb. 13, 2015) ("As the Second Circuit

has noted, the absence of evidence from the claimed period of disability may itself be considered

substantial evidence."), <u>report & rec. adopted</u>, 2015 WL 1266895 (S.D.N.Y. Mar. 18, 2015).[34/]

Accordingly, ALJ Barr's determination that Soto's chronic venous insufficiency did not meet the

---

[34/]    <u>See also</u>, <u>e.g.</u>, <u>Marte</u> v. <u>Colvin</u>, 14 Civ. 0832, 2014 WL 5088078 at *18 (S.D.N.Y. Oct. 9, 2014) (Peck, M.J.); <u>Rodriguez</u> v. <u>Barnhart</u>, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); <u>Catrain</u> v. <u>Barnhart</u>, 325 F. Supp. 2d 183, 192 (E.D.N.Y. 2004) ("[T]he ALJ is entitled to rely on the absence of opinions. . . ."); <u>Jiang</u> v. <u>Barnhart</u>, 03 Civ. 0077, 2003 WL 21526937 at *13 (S.D.N.Y. July 8, 2003) (Peck, M.J.), <u>report & rec. adopted</u>, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); <u>De Roman</u> v. <u>Barnhart</u>, 03 Civ. 0075, 2003 WL 21511160 at *13 (S.D.N.Y. July 2, 2003) (Peck, M.J.); <u>Alvarez</u> v. <u>Barnhart</u>, 02 Civ. 3121, 2002 WL 31663570 at *10 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), <u>report & rec. adopted</u>, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); <u>De La Cruz</u> v. <u>Chater</u>, 937 F. Supp. 194, 197 (E.D.N.Y. 1996).

requirements of a listed impairment is supported by substantial evidence in the record. The Court

therefore proceeds with the analysis.

### D.   Residual Functional Capacity And Credibility Determinations

#### 1.   Residual Functional Capacity Determination

ALJ Barr found that Soto had the RFC "to perform a range of sedentary work as

defined in 20 CFR 404.1567(a) and 416.967(a)."  (See page 21 above.)  Work is defined as

sedentary if it

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties.  Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  In assessing Soto's RFC, ALJ Barr specified that

> in addition to the exertional requirements, [Soto] must avoid all exposure to heights,
> operating machinery, and driving.  Further, he is limited to simple, unskilled work,
> in a low-stress environment defined as only occasional decision-making, only
> occasional changes in the work setting, and no assembly line-type work.  Lastly, the
> position must be low contact, defined as having only occasional face-to-face
> interaction with the general public and only occasional contact with co-workers.

(R. 14.)  In making this determination, ALJ Barr considered "all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence."  (Id.)  ALJ Barr's conclusion that Soto could perform sedentary work with certain

restrictions for his exertional and nonexertional limitations is supported by the opinion of

consultative physician Dr. Joshi, who found that Soto appeared to be "in no acute distress," with a

normal gait and stance, and opined that Soto had only mild limitations to "walking, climbing, and

standing."  (See page 16 above.)  While Soto has been treated extensively for chronic venous

insufficiency and podiatric issues associated with diabetes, the medical records confirm that his

treatment has been "essentially routine, and there have been no surgeries, extended inpatient hospitalizations, or repeated emergency room treatments" (R. 18), and his conditions have shown improvement when he is compliant with his doctors' orders and medication (see page 22 above). Soto was diagnosed with lumbago after Dr. Joshi's consultative examination (R. 572), but Soto's treating physician nevertheless opined after that diagnosis that Soto "would benefit from a clerical job" (see page 15 above).

ALJ Barr accounted for Soto's mental limitations by restricting him to "simple, unskilled work," in a low stress, low contact environment.  (See pages 21, 37 above.)  Soto's capacity to perform such work is supported by the findings of Dr. Bougakov, who noted that Soto could "follow and understand simple directions and instructions, [and] perform simple tasks." (See page 17 above.) Dr. Bougakov's findings are consistent with Dr. Kamin's conclusion that Soto could perform "simple task work." (See page 19 above.)  Although Soto's GAF was assessed at 45 in 2003 (see page 5 above), indicating severe symptoms, his GAF increased to 70-72 in 2009, indicating symptoms in the mild to transient range (see page 6 above).  Further, Dr. Leggett, who has been Soto's treating psychologist since 2009, found at an examination on August 7, 2012 that Soto was "stable at his psych baseline," and refused to sign a letter stating that Soto was incapable of working. (See page 14 above.)

Moreover, Soto is independent in his activities of daily living.  Soto is able to perform household chores, he shops for food and clothing, he cooks for himself and his mother and takes public transportation independently.  (See page 3 above.)  Soto testified that unless he has a medical appointment, he leaves the house most mornings at about six or seven and returns at three in the afternoon, spending approximately eight hours a day attending various programs sponsored

by Narco Freedom, the YMCA and Citywise.  (See page 3 above.)  These programs are not all in the same building, but rather "in the same area," and Soto walks to and from each of them.  (R. 61.)

Finally, Soto argues that because "prolonged sitting is one activity that aggravates chronic venous insufficiency," ALJ Barr erred in finding that he could "meet the sitting demands of sedentary work."  (Soto Br. at 15.)  This contention is unavailing.   Not only does Soto's chronic venous insufficiency fail to meet the requirements of a listed impairment (see pages 35-37 above), but ALJ Barr expressly accounted for Soto's need to alternate between sitting and standing when questioning the vocational expert (see page 20 above).

Accordingly, the Court finds that ALJ Barr's assessment that Soto had the capacity to perform sedentary work with certain limitations caused by his physical and mental impairments–i.e. that he can perform "simple, unskilled work, in a low-stress environment defined as only occasional decision-making, only occasional changes in the work setting, and no assembly line-type work. . . . [and] only occasional face-to-face interaction with the general public and only occasional contact with co-workers" (R. 14)–is supported by substantial evidence.  See, e.g., Sizer v. Colvin, 592 F. App'x 46, 47 (2d Cir. 2015) (RFC determination "based on the medical opinion evidence, the objective medical evidence, and [claimant's] testimony at the ALJ hearing" was supported by substantial evidence).

## 2.    Credibility

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue,

465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is

required to take the claimant's reports of pain and other limitations into account,' he or she is 'not

require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may

exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record.'" (citations omitted)); <u>Genier</u> v. <u>Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010)

("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and

other limitations into account, but is not required to accept the claimant's subjective complaints

without question; he may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." (citations omitted)); <u>Brown</u> v. <u>Comm'r of Soc. Sec.</u>, 310

F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.'")[35/]  In addition, "courts must show special deference to an

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor

---

[35/]   <u>See also</u>, <u>e.g.</u>, <u>Rivers</u> v. <u>Astrue</u>, 280 F. App'x 20, 22 (2d Cir. 2008) (same); <u>Thompson</u> v.
<u>Barnhart</u>, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's
"description of her symptoms was at odds with her treatment history, her medication regime,
and her daily routine"); <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999); <u>Norman</u> v. <u>Astrue</u>,
912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner]
to evaluate the credibility of plaintiff's complaints and render an independent judgment in
light of the medical findings and other evidence regarding the true extent of such
symptomatology.'"); <u>Astolos</u> v. <u>Astrue</u>, No. 06-CV-678, 2009 WL 3333234 at *12
(W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain
complaints were not supported by the medical record); <u>Speruggia</u> v. <u>Astrue</u>, No. 05-CV-
3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept
plaintiff's subjective testimony about her symptoms without question' and should determine
a plaintiff's credibility 'in light of all the evidence.'"); <u>Soto</u> v. <u>Barnhart</u>, 01 Civ. 7905, 2002
WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion
to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of
medical findings and other evidence, regarding the true extent of pain alleged by the
claimant."); <u>Brandon</u> v. <u>Bowen</u>, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

while [the plaintiff was] testifying." <u>Marquez</u> v. <u>Colvin</u>, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[36/]

ALJ Barr considered Soto's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (R. 14), and determined that Soto's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Soto's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." (R. 18.)[37/]

---

[36/]   <u>Accord</u>, <u>e.g.</u>, <u>Campbell</u> v. <u>Astrue</u>, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner] not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); <u>Nunez</u> v. <u>Astrue</u>, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); <u>Guzman</u> v. <u>Astrue</u>, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); <u>Ruiz</u> v. <u>Barnhart</u>, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); <u>Gernavage</u> v. <u>Shalala</u>, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); <u>Mejias</u> v. <u>Soc. Sec. Admin.</u>, 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); <u>Wrennick</u> v. <u>Sec'y of Health, Educ. & Welfare</u>, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[37/]   This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and "prejudicial to the claimant." <u>Cruz</u> v. <u>Colvin</u>, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), <u>report & rec. adopted</u>, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); <u>see also</u>, <u>e.g.</u>, <u>Hopkins</u> v. <u>Colvin</u>, 13 Civ. 4803, 2014 WL 2526837 at *18 n.17 (S.D.N.Y. June 5, 2014) (Peck, M.J.), <u>report & rec. adopted</u>, 13 Civ. 4803, 2014 WL 4392209 (S.D.N.Y. Sept. 5, 2014); <u>Givens</u> v. <u>Colvin</u>, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.); <u>Paulino</u> v. <u>Colvin</u>, 13 Civ. 3718, 2014 WL 2120544 at *17 n.18 (S.D.N.Y. May 13, 2014) (Peck, M.J.). Nevertheless, while ALJ Barr's language leaves something to be desired, here unlike in <u>Cruz</u>, she gave sufficient explanation for finding Soto's claim of disability to lack credibility—including careful review of the contrary medical evidence and Soto's testimony that he is independent in his activities of daily living despite his medical impairments—that the Court concludes the ALJ's finding is supported by substantial evidence and a remand is not called for. <u>See</u>, <u>e.g.</u>, <u>Hopkins</u> v. <u>Colvin</u>, 2014 WL 2526837 at *18 n.17; <u>Givens</u> v. <u>Colvin</u>, 2014 WL 1394965 at *10 n.18; <u>Paulino</u> v. <u>Colvin</u>, 2014 WL 2120544 at *17 n.18.

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[38]

ALJ Barr properly applied this two-step process to Soto's case.  (R. 14-20.) ALJ Barr assessed Soto's credibility by considering all of the relevant medical evidence in the record in light of Soto's statements. (R. 15-18.)  First, ALJ Barr found that although Soto claimed that "his physical impairments have gotten worse" and the "side effects [of his medication] keep him from working" (R. 15), the "treatment records for both his psychiatric and physical disorders do not reflect a persistence of significantly abnormal symptoms" (R. 18).  Concerning Soto's mental impairments, ALJ Barr noted that he had "good response to [therapeutic] treatment"(R. 15) and that his treating psychiatrist found that he had "few active symptoms so long as he was compliant with his medication regimen" (R. 16).  ALJ Barr noted that although Soto's treating psychologist, Dr.

---

[38]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

Leggett, indicated on March 7, 2010 that Soto was unemployable for three months (R. 15), on

August 7, 2012 Dr. Leggett declined to write another such letter (R. 17).

      In terms of Soto's physical impairments, ALJ Barr found that "the record similarly

shows treatment that is largely routine and outpatient in nature, and generally controlled on a

prescription drug regimen." (R. 17.)  ALJ Barr noted that Soto's "complaints of back pain have not

been correlated with MRI, CT-scan or even X-ray examinations," and that his claim that he faints

due to high blood pressure was entirely unsupported by medical evidence.  (R. 19.)  ALJ Barr

referred to Dr. Joshi's consultative physical examination of Soto, which "apart from decreased

sensation in [Soto's] left great toe," yielded  results "largely within normal limits."  (R. 17.)  ALJ

Barr noted that while Soto was hospitalized as an inpatient at Bronx Lebanon for "an episode of

pneumonia" his medical records otherwise "do not reflect a significantly debilitating degree of

impairments."   (Id.)   ALJ Barr noted that after Soto was diagnosed with chronic venous

insufficiency he received regular outpatient care but "did not require any additional emergency room

visits or inpatient hospitalizations on that basis."  (Id.)  Finally, ALJ Barr noted that on August 7,

2012, Soto's treating physician refused to write a letter stating that he was unable to work. (R. 18.)

      Therefore, ALJ Barr correctly concluded that the medical evidence of record did not

"describe the same degree and persistence of mental and physical impairments that [Soto] alleged."

(R. 15.) See, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014) ("After extensively

detailing the medical evidence and [the claimant's] testimony, the ALJ afforded her statements only

'partial credibility' because 'they were inconsistent with the objective evidence in the record.'  Our

independent review of the administrative record supports the ALJ's credibility determination.  For

example, while [the claimant] testified that her constant pain prevented her from standing for more

than five minutes without leaning against something or dressing herself without assistance, her

treating physician consistently prescribed a 'conservative treatment' regimen that consisted of 'walking[,] home exercise program[s],' and 'gentle stretching.' In addition, [the claimant's] testimony that she could not sit for more than five minutes at a time during the relevant period and that the combination of her pain and the medications she took for that pain made her unable to concentrate is inconsistent with the fact that, during that same time, she successfully completed a computer training course that required her to take four-hour classes three days per week."); McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) (The "'ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'"); DeJesus v. Colvin, 12 Civ. 7354, 2014 WL 667389 at *20 (S.D.N.Y. Feb. 18, 2014) ("[T]he ALJ properly chose to give little weight to [claimant's] unsupported complaints and claims given that he analyzed them in light of the objective medical evidence in the record."); Jones v. Comm'r of Soc. Sec., 12 Civ. 6164, 2013 WL 4482702 at *9 (S.D.N.Y. Aug. 22, 2013) (ALJ's finding that plaintiff was not disabled was supported by substantial evidence where, inter alia, "notwithstanding Plaintiff's complaints, his treatment was largely conservative and never required in-patient care").[39]

---

[39] See also, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *14 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) ("'[T]he level of medical treatment documented to date is not commensurate with the claimant's pain allegations.' Besides [the claimant's] right knee meniscal tear diagnosis and the subsequent arthroscopic surgery, all other examinations and treatments were conservative in nature and showed that [the claimant's] alleged conditions were mild. In addition, as [the ALJ] pointed out, the 'Radiographic studies (x-rays, CT scans, and MRI studies) have consistently chronicled slight/mild clinical orthopedic findings.' Regarding [the claimant's] shoulder pain, [the doctor] diagnosed her with right shoulder impingement syndrome and two subsequent MRI studies revealed mild tendinosis of the superior rotator cuff, mild arthrosis of the AC joint, and mild bursitis. Regarding [the claimant's] hip pain, x-rays revealed only mild degenerative changes bilaterally. Moreover, both tests used to evaluate [the claimant's] back pain, a CT scan and an MRI of the lumbar spine, showed mild or minimal disc bulges and mild L5-S1 degenerative disc space
(continued...)

Second, ALJ Barr found that Soto's statements about his condition and daily activities contradicted his claim of total disability.  (R. 18-20.)  ALJ Barr noted that Soto's reported daily activities include "some ability to shop, cook, clean and do laundry" as well as spending "several hours each in treatment programs for his history of substance abuse."  (R. 18-19.)  ALJ Barr found that Soto's "admitted physical capabilities–to sit for 50 minutes at a time, stand for 30 minutes at a time, and lift up to 10 pounds–are roughly congruent with the [sedentary] residual functional capacity assessment."  (R. 19.)  ALJ Barr gave credit to Soto's "symptoms of lower extremity pain and swelling" but found that those "symptoms alone do not suggest a more restrictive physical functional capacity than [Soto] himself has admitted to."  (Id.)  ALJ Barr also gave credit to Soto's complaint that his medication caused drowsiness, but noted that Soto did not report drowsiness as a side effect in his "Disability Report - Appeals" and therefore concluded that "it does not appear from the record that the side effects are so debilitating and unacceptable as to preclude all work." (R. 19.)

Thus, ALJ Barr met her burden in finding Soto not entirely credible because the objective medical evidence and his stated independence in activities of daily living failed to support his claims of disability.  See, e.g., Hilliard v. Colvin, 2013 WL 5863546 at *15 (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see also, e.g., Stanton v. Astrue, 370 F. App'x

---

39/      (...continued)
         narrowing.  [The claimant's] medical records show that she has no abnormalities in terms of
         gait or station, and that she maintains intact neurological functioning.  Therefore, [the ALJ]
         correctly concluded that 'the objective medical evidence fails to corroborate contentions of
         total disability.'" (citations omitted)).

231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ

identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230

(2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial

evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's]

allegations of disability contradicted the broader evidence"); Kessler v. Colvin, 13 Civ. 1760, 2014

WL 4651895 at *14 (S.D.N.Y. Sept. 17, 2014) (Claimant's "subjective complaints of pain lacked

the necessary objective medical support, and therefore were not entitled to any special weight.

Accordingly, the ALJ's adverse credibility determination was not erroneous."); Givens v. Colvin,

13 Civ. 4762, 2014 WL 1394965 at *10-11 (S.D.N.Y. Apr. 11, 2014) (Peck. M.J.) (ALJ properly

found claimant's disability claims not entirely credible where claimant "admitted that he was capable

of performing many day-to-day activities, such as reading, watching television, caring for his

personal needs, using public transportation, and going to church."); Crayton v. Astrue, 944 F. Supp.

2d 231, 235 (W.D.N.Y. 2013) ("Plaintiff also challenges the ALJ's finding that plaintiff's complaints

of disabling pain were not wholly credible. . . . Here, the ALJ rejected plaintiff's testimony based

on several inconsistencies. . . . [P]laintiff's complaints of disabling pain appear to conflict with her

medical treatment records, which reflect few complaints and no aggressive or additional treatment

for back, knee and wrist pain . . . . For example, plaintiff listed, among her activities of daily living,

dressing and caring for herself, performing light housework and grocery shopping, and stated that

she could lift ten pounds . . . . Given the inconsistencies between plaintiff's reports of disabling pain,

other testimony by plaintiff and the rest of the record, I find no basis to disturb the ALJ's findings

as to plaintiff's credibility."); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y.

Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's

47

ability to engage in certain daily activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### E. Soto Did Not Have The Ability To Perform His Past Relevant Work

The fourth step of the five-step analysis asks whether Soto had the RFC to perform his past relevant work as a receiving clerk, stock clerk, janitor and groundskeeper.  (See page 22 above.)  ALJ Barr found that Soto was "unable to perform any past relevant work" given his sedentary RFC, and his age, education and work experience. (R. 20.)  Because ALJ Barr's findings at this stage benefit Soto, the Court proceeds to step five of the five-step analysis.

### F. Soto Had The Ability To Perform Other Work In The National Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[40/]

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

---

[40/]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"

(quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Barr properly relied on the testimony of vocational expert Vaughn to determine that jobs Soto could perform exist in the national economy. (See pages 20-21 above.)[41/] Vaughn testified that a hypothetical individual of Soto's age, education and work experience, who was limited to low stress work, and no assembly line work, with only occasional interaction with the general public and the option to work while sitting or standing, could perform several jobs in the national economy. (See page 20 above.) In particular, Vaughn opined that an individual with those limitations and a sedentary RFC could work as a lens inserter or buckler and lacer. (See page 20 above.) ALJ Barr relied upon the vocational expert's testimony in reaching her conclusion when she

---

[41/]   A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

specifically referred to those jobs in her findings.  (R. 21.)  Accordingly, ALJ Barr's decision was supported by substantial evidence.

## IV.     SOTO'S NEWLY PROFFERED EVIDENCE DOES NOT WARRANT REMAND

Attached to Soto's motion for judgment on the pleadings are the results of a March 1, 2013 MRI scan that was not a part of the administrative record.  (See page 23 above.)  Soto argues that the case should be remanded to the Commissioner for consideration of the new evidence.  (Soto Br. at 16-17.)

Although the Court cannot consider new evidence, this Court may remand to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  The Second Circuit has summarized the three-part showing required by this provision as follows:

> [A]n appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative.  The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently.  Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (citations & quotations omitted) (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)).[42/]

---

[42/]     Accord, e.g., Mulrain v. Comm'r of Soc. Sec., 431 F. App'x 38, 39 (2d Cir. 2011); Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991); Smith v. Comm'r of Soc. Sec., No. 12-CV-1879, 2014 WL 3392336 at *8 (N.D.N.Y. July 10, 2014) ("remand for taking of additional evidence is appropriate only when a claimant satisfies all three criteria"); Patterson v. Colvin, 13 Civ. 4386, 2014 WL 2566071 at *15 (S.D.N.Y. June 6, 2014); DeJesus v. Apfel, 97 Civ. 4779, 2000 WL 1586419 at *3 (S.D.N.Y. Oct. 24, 2000); Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *2 & n.6  (S.D.N.Y. Mar. 29, 2000)
(continued...)

"'Good cause' for failing to present evidence in a prior proceeding exists where . . . the evidence surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding." Lisa v. Sec'y of Dept. of Health & Human Servs., 940 F.2d 40, 43 (2d Cir.1991).  To show good cause, the claimant "must adequately explain [the] failure to incorporate the proffered evidence into the administrative record." Id. at 45; see also, e.g., Firpo v. Chater, No. 95-6081, 100 F.3d 943 (table), 1996 WL 49258 at *3 (2d Cir. Feb. 7, 1996) ("Concerns for finality dictate that claimants be given a single opportunity to prove their entitlement to benefits for a particular period.  We should therefore be reluctant to force the SSA to reopen its proceedings for new evidence unless the claimant can justify the delay in offering the new evidence."(citation omitted)); Colabufo v. Colvin, No. 13-CV-188, 2014 WL 2510559 at *4 (N.D.N.Y. June 4, 2014); Lentola v. Astrue, No. 07-CV-48, 2008 WL 4239874 at *3-4 (W.D.N.Y. Sept. 12, 2008).

Soto offers no explanation for his failure to submit the now-proffered evidence to the Appeals Council, although the Commissioner's decision did not become final for more than fourteen months after the MRI was taken.  (See page 23 above.)  Accordingly, Soto has not shown good cause for failing to present the new evidence during the pendency of the administrative proceeding, and remand for its consideration is not warranted.  See, e.g., Schaal v. Apfel, 134 F.3d 496, 506 (2d Cir. 1998) ("Plaintiff has failed to justify the delay in submitting these reports, and therefore has not

---

42/      (...continued)
(Peck, M.J.); Pantojas v. Apfel, 87 F. Supp. 2d 334, 339 (S.D.N.Y. 2000); Casiano v. Apfel, 39 F. Supp. 2d 326, 331 (S.D.N.Y. 1999), aff'd, No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000); Hursey v. Apfel, No. 97-CV-4757, 1998 WL 812585 at *4 (E.D.N.Y. Apr. 27, 1998); Tracy v. Apfel, No. 97-CV-4357, 1998 WL 765137 at *4 (E.D.N.Y. Apr. 22, 1998); Madrigal v. Callahan, 96 Civ. 7558, 1997 WL 441903 at *7-8 (S.D.N.Y. Aug. 6, 1997); Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996).

met the statutory requirement of demonstrating good cause.");  Maniscalco v. Colvin, 13 Civ. 4359, 2015 WL 273689 at *15 (S.D.N.Y. Jan. 22, 2015) ("Plaintiff provides no reason, much less good cause, for failing to incorporate the new evidence into the record in the prior proceeding. For this reason alone, Plaintiff's request for remand for consideration of new evidence should be denied."); Overby v. Colvin, No. Civ. A. 12-663, 2013 WL 1814594 at *5 (N.D.N.Y. Apr. 4, 2013) ("Because [claimant] offers no other explanation as to why the now-proffered records were not timely submitted during the administrative proceedings, he fails to carry his burden to show good cause."), report & rec. adopted, 2013 WL 1808020 (N.D.N.Y. Apr. 29, 2013); Batista v. Astrue, No. 08-CV-2136, 2010 WL 3924684 at *11 (E.D.N.Y. Sept. 29, 2010) ("[I]n the absence of any showing of good cause for failure to incorporate this evidence into the original record, this new evidence does not warrant remand."); Zimmer v. Astrue, No. 07-CV-4036, 2009 WL 5066782 at *5 (E.D.N.Y. Dec. 23, 2009) (claimant did not provide "a compelling cause to obviate her responsibility to produce timely evidence before the Commissioner," thus "the Commissioner need not consider [the] evidence.").

## **CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 12) is <u>GRANTED</u> and Soto's motion for judgment on the pleadings (Dkt. No.

19) is <u>DENIED</u>.  The Clerk of Court shall enter judgment accordingly.


SO ORDERED.

Dated:      New York, New York
            April 14, 2015



                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge


Copies by ECF to:      All Counsel